AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Danielle Torres, being first duly sworn, hereby depose and state as follows:

INTRODUCTION

1.   I make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the electronic device(s) and removable media listed in Attachment A, which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.   There is probable cause to believe that a search of these devices will lead to evidence of violations of Title 8 U.S.C. § 1324 as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3.   The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed or have been told to me directly by other members of the investigative team, which includes federal, state, or local law enforcement officers with whom I have worked on this investigation. As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause.

SUSPECTED VIOLATIONS

- Title 8 U.S.C. § 1324, Bringing in, transportation, and harboring certain aliens.

1

## AFFIANT BACKGROUND

4. I am a Special Agent employed by Homeland Security Investigations (HSI) and have been since September 2022. I am currently assigned to the Nogales, Arizona office. I am a graduate of the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training which were conducted at the Federal Law Enforcement Training Center in Glynco, Georgia.

5. As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law, including those enumerated in Title 8, Title 18, Title 19, Title 21, and Title 31 of the United States Code. I received my Bachelor's degree in Criminal Justice and Public Management and Policy from the University of Arizona in 2019. I received my Master of Public Administration from Wayland Baptist University in 2021.

6. Prior to becoming a Special Agent with HSI, I was employed by the United States Attorney's Office (USAO) in the District of Arizona as a legal assistant in the Organized Crime and Drug Enforcement Task Force Unit (OCDETF). The OCDETF Unit focused on Transnational Criminal Originations (TCOs) and Human Smuggling Organizations (HSOs). During my employment with the USAO I reviewed and prepared numerous affidavits and warrant packets. I also reviewed investigative reports prepared by law enforcement during investigations into both TCOs and HSOs.

7. During my law enforcement career, I have participated in drug trafficking investigations involving violations of state and federal law. I have been involved in coordinated surveillance operations, conducted seizures, and led or assisted in

interrogations of suspects and interviews of witnesses. I am familiar with the federal procedures involved in the execution of federal search warrants. Further, I have participated in the execution of search warrants for persons and places connected with the possession, manufacturing, and distribution of illicit contraband. I received Title III training in the academy, received guidance in Title III investigations from co-workers with extensive experience, and worked on Title III investigations.

8. Through collective experience, I have become familiar with the operational techniques and structure of human smuggling organizations (HSOs). I also have become familiar with how HSOs collect smuggling payments, covertly move undocumented non-citizens (UNCs) across the United States border, transport and harbor UNCs to their final destinations in exchange for a final smuggling fee and launder the proceeds of this illicit activity. Additionally, I am familiar with the tactics employed by HSOs to counter law enforcement investigative techniques. I am also familiar with how human smugglers use cellular phones and other electronic devices to coordinate and facilitate their illicit activities.

9. Based on my training, experience, and conversations with other law enforcement officials, I know that the experienced and well-structured HSOs usually compartmentalize their illegal operations. These organizations subcontract their operations to other organizations and transportation cells who work independently from one another to facilitate the smuggling of UNCs. These cells can carry out different tasks, including the receipt and transportation of UNCs, the temporary housing of the UNCs as they await

follow-on transportation, and the transportation of UNCs to different cities within the United States.

10. Based on my training and experience, and conversations with other law enforcement officials, I know that the compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization. This method of operation minimizes the potential damage a cooperating individual could inflict on the organization and further reduces the adverse impact of a particular law enforcement action against the organization. However, I have observed that, even in the most compartmentalized organizations, there is often contact between the cells, as well as frequent contact between the cells and upper management.

11. Based on my background, training, and experience, I also know that human smuggling requires a high degree of constant coordination among the participants. The cheapest and easiest way to facilitate this coordination is through the use of cellular telephones. I know that individuals involved in human smuggling often use cellular telephones to arrange, coordinate, and monitor criminal activities, including communicating between/among coordinators, scouts, stash house operators, couriers/transporters and, in the case of human smuggling, the smuggled UNCs themselves. Traffickers also use cellular telephones to communicate among themselves while performing counter-surveillance activities and to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans. Additionally, if a member of the organization is intercepted or arrested by law enforcement, other

participants will use cellular telephones to alert each other as soon as possible so the group may take steps to hide or destroy evidence or otherwise conceal its activities.

12. In addition, I know from experience that individuals engaged in human smuggling will use and carry multiple cellular telephones, often at the same time, and repeatedly change cellular telephones to avoid detection by law enforcement. To further evade law enforcement, they often will subscribe to a telephone using fictitious identifiers (e.g., false names and/or addresses) or in other person's names.

13. I know that both members of HSOs and UNCs often avail themselves of all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed dial, taking and storing photos and video, and maintaining contact lists containing contact information for their criminal associates to accomplish their criminal activities. Both smugglers and UNCs also will access third-party applications (e.g., WhatsApp, Facebook, Instagram) via their cellular phones to perform these same functions. I also am aware that most cellular telephones and third-party applications have the capacity to collect and store precise GPS data documenting the phone's physical location over time.

14. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from records, law enforcement officers, witnesses, and other sources of information. This affidavit does not set forth all my knowledge about this matter and is intended to show merely that there is sufficient probable cause for the requested warrant.

IDENTIFICATION OF THE DEVICES TO BE EXAMINED

15. The property to be searched is documented on DHS Forms 6051S and is further described in **Attachment A**. Moreover, the target devices are currently in HSI custody at the HSI office located in Rio Rico, Arizona. The devices are identified as **Target Device 1** and **Target Device 2** in this investigation. The applied-for warrant would authorize the forensic examination of the device by government-authorized persons for the purpose of identifying electronically stored data particularly described in **Attachment B**.

- "**Target Device 1**" – FPF Item 2023265800022501, line Item 0002, "Redmi Phone Navy" (Jose Jesus Moreno)
- "**Target Device 2**" – FPF Item 2023265800022501, Line Item 0003, "Black Samsung Smartphone" (Jose Verdugo-Gandara)

PROBABLE CAUSE

16. On May 27th, 2023, Border Patrol Agent (BPA) Couch was approached by a Red Chevrolet Tahoe bearing Arizona license plate WJA6WM, in a human smuggling corridor in Sonoita, AZ. The Tahoe was driven by a male, later identified as Mario Leonard MONTANO, who is the registered owner of the Tahoe. MONTANO greeted BPA Couch and started up a conversation.

17. Due to inconsistencies in MONTANO's story and dark tint on the windows of the Tahoe, BPA Couch asked MONTANO to roll down the rear window. MONTANO stated, "I'm not going to do that," turned away from BPA Couch, and sped off. Approximately 200-300 yards north of the initial encounter, BPA Couch encountered the Chevrolet Tahoe overturned and observed 4 bodies ejected from the vehicle and 1

6

individual up and walking around. When additional BPAs arrived on scene a 6th individual was found approximately 100 feet off the side of the road laying behind a tree. At no point did BPA Couch activate his lights or sirens.

18.     A total of 5 UNCs were in the vehicle and all, including the driver, were transported to the hospital. 3 UNCs and the driver were life flighted to Banner University Medical Center in Tucson, AZ in critical condition. 1 UNC was transported by ambulance to Banner University Medical Center and 1 UNC was transported by ambulance to the Canyon Vista Hospital in Sierra Vista, AZ.

19.     Sonoita Border Patrol Station advised HSI Special Agents (SAs) of a vehicle rollover near the Forest Service Road (FSR) 799 and the AZ Trail. HSI SAs responded to Banner UMC Emergency Room Trauma Bay and Canyon Vista Medical Center in Sierra Vista, AZ. HSI SAs Pinto and Torres conducted interviews of 3 UNCs that were conscious and coherent at the Banner University Medical Center (UMC) Emergency Room Trauma Bay: Anatael RODRIGUEZ-Santos; Jose Jesus MORENO; and Jose VERDUGO-Gandara.

20.     In his interview with HSI SAs on May 27, 2023, Jose MORENO stated the following. MORENO explained that he, along with his group of five (5), jumped over the border, got into the Tahoe, and ran into a BPA. The driver and BPA talked for a little bit and then the driver took off and a few moments later they flipped. MORENO stated he did not understand what the driver and BPA were talking about. The car was a red Tahoe, and he was in the back seat laying down on the floorboard. MORENO said he was instructed to cross the border and when they crossed a red truck would pick them up. He paid $10,000

USD. All 5 UNCs crossed together in a place with a small fence on May 27, 2023. MORENO identified the driver of the Tahoe as MONTANO from a photographic lineup. At the time of the accident MORENO's phone **Target Device 1** was seized.

21. On May 28, 2023, HSI SAs conducted an interview of Jose VERDUGO-Gandara. HSI SA Dempsey provided translation for this interview over the phone. VERDUGO-Gandara stated the following: The vehicle he was in was a red Chevrolet Tahoe. He claimed he did not know the person who was driving. He walked across the border and was instructed to wait in a certain spot. He was going to be taken to a place in Phoenix. He paid $1,000 US dollars and would pay $10,000 more after he crossed. He was in the back seat laying down. VERDUGO-Gandara overheard a conversation between the driver and BPA, and the driver told them to get ready to run. At the time of the accident VERDUGO-Gandara's phone **Target Device 2** was seized.

22. HSI SAs also went to the Sonoita Border Patrol (BP) station to interview Luis Cesar CHAN-Pacheco, who was released from Canyon Vista Hospital. CHAN-Pacheco provided consent for a search of his cell phone. During a cursory search of his cell phone, SAs discovered WhatsApp conversation containing typed and audio messages detailing smuggling arrangements made by CHAN-Pacheco. These messages included communications with an individual named "Thomas" who helped plan CHAN-Pacheco's crossing into the United States. CHAN-Pacheco was shown a photo lineup and was unable to identify the driver.

23. MORENO, CHAN-Pacheco, and VERDUGO-Gandara stated they were provided instruction before they crossed the international border. I know based on my